UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CARLOS PEREZ-CALDERON,

                    Petitioner,

        v.

MELISSA ANDREWJESKI,

                    Respondent.

CASE NO. 3:22-CV-5119-JHC-DWC

REPORT AND RECOMMENDATION

Noting Date: August 19, 2022

The District Court has referred this action to United States Magistrate Judge David W. Christel. Petitioner Carlos Perez-Calderon filed his federal habeas petition pursuant to 28 U.S.C. § 2254, seeking relief from his state court conviction and sentence. *See* Dkt. 1. The Court concludes that the state courts' adjudication of the three grounds raised in the Petition was not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned recommends the Petition be denied and a certificate of appealability not be issued.

## I.    Background

A. <u>Factual Background</u>

On July 7, 2016, in the Pierce County superior court ("trial court"), a jury found Petitioner guilty of murder in the second degree. Dkt. 12-1, Ex. 1, at 2–3. Petitioner was sentenced to 360 months confinement on August 19, 2016. *See id*. at 2–15. The Court of Appeals of the State of Washington ("state court of appeals") summarized the facts of Petitioner's case as follows:

> Calderon asked his ex-girlfriend, Amanda "Mindy"[ ] Hughes, to watch his house and dog for an extended period of time because he had an upcoming military assignment at the Yakima Training Center. Hughes and her two young daughters, MC, age nine, and GH, age five, began staying with Calderon during the week before his departure for Yakima.

> MC testified that "Carlos and my mom were fighting . . . [b]ecause my mom wanted to go to the food bank. And . . . Carlos wouldn't take her, or something like that." Verbatim Report of Proceedings (VRP) (June 28, 2016) at 287. MC testified her mom "grabbed some metal thing and threw it at him." VRP (June 28, 2016) at 288, 305. She testified Calderon "was laying down on the couch . . . [and] saying mean things." VRP (June 28, 2016) at 288. MC said she initially witnessed them arguing, but Hughes told her to go to her room where she could only hear "them fighting . . . saying cuss words to each other and stuff." VRP (June 28, 2016) at 287-89. MC testified she heard "something . . . go, boom" and remembered a gun was lying on the living room table. VRP (June 28, 2016) at 290, 296. The prosecutor asked, "Did you see him with a gun in his hand at any point in time?" MC responded, "I think so, but I don't know." VRP (June 28, 2016) at 292. She added, "I don't know if I really did. I thought so, but I don't know." VRP (June 28, 2016) at 296. MC testified she did not see the gun go off, but heard it.

> Calderon's friend, Ivan Montes, testified that they had been working on a car engine earlier that day at Calderon's house. Montes left to run some errands, and when he returned, he saw Calderon on the phone with 911 and Hughes lying on the floor. Montes testified as follows:

> [Montes]:  Carlos told me that, "We got into a fight. She got mad at me and she flipped the table. My gun was on the table. It went off. She's been shot." That was after I got the dogs [sic] out. So immediately after that, I asked him where the hell is the gun. Those were my exact words to him. I looked around. He says he couldn't find it. He didn't know where it was.
> [Defense]: Did you find the gun?

[Montes]:  Yes, I'm the one who recovered the gun. I cleared the weapon and secured it next to a metal tin container next to the microwave.
[Defense]: Where did you find the gun?
[Montes]:  It was not close – it wasn't anywhere in line, or near Mindy.

VRP (June 28, 2016) at 241.

When Officer Michael Wulff and other officers arrived on scene, they ordered everyone out of the house and then heard a man yell, "I am doing CPR [cardiopulmonary resuscitations]. Get in here." VRP (June 27, 2016) at 161-62. Wulff testified that when he entered the house, "I observed a female laying on the floor in the corner of the living room. I observed she was bleeding. I observed a male doing chest compressions, CPR, and another male standing up next to her." VRP (June 27, 2016) at 162.

Officer Joe Kulp testified:

When I entered the house, it was sort of chaotic. I observed a female on the floor to my right. Her feet were facing me. There were two males performing medical aid on the female. There seemed to be a large amount of blood there. The gentleman on the right was on his knees, and he appeared to be what I recall to be like holding a pressure type using his hand over what appeared to be a wound on the victim's chest.

VRP (June 27, 2016) at 178-79. Kolp stated that Calderon was holding the wound, compressing it, and had a lot of blood on him. He observed that Calderon appeared to be in a "panic state." VRP (June 27, 2016) at 188.

Wulff testified that he "asked what happened, trying to figure out generally what had occurred." VRP (June 27, 2016) at 164. "[Calderon] said he and the female had been in an argument about her wanting to go to the food bank. During the argument, she flipped the table over. The gun had gone off and hit her in the chest." VRP (June 27, 2016) at 164. Wulff testified Calderon stated, "The gun was on the table and it went off and hit her in the chest." VRP (June 27, 2016) at 174-75.

Officer Paul Osness testified that he walked into the house and "saw what appeared to be a living room table on its top." VRP (June 27, 2016) at 193. Osness testified that one of the officers stated the gun was secured and directed him to the gun, which was unloaded and sitting in a bowl, in the kitchen, 10 to 15 feet away from the victim.

Kolp testified that while he was walking Calderon to his patrol car and after advising him of his *Miranda* rights, Calderon said, "We were arguing. She flipped the table. The gun went off." VRP (June 27, 2016) at 180. Kolp also testified

Calderon stated that "he was laying [sic] on the couch, she began to scream at him for not going to the food bank." VRP (June 27, 2016) at 181.

Detective Reynaldo Punzalan testified that he interrogated Calderon at the Lakewood Police Station after the shooting occurred. Calderon told Punzalan that "they had an argument about food in the house." VRP (June 28, 2016) at 357. Calderon said that "she had swatted him with an ACU [Army combat uniform] digital camouflage shirt top" and threw a glass chalice at him, which hit him and broke. VRP (June 28, 2016) at 357-58. He said Hughes then flipped the living room table towards him and that the gun was lying on the table. VRP (June 28, 2016) at 359. Calderon told Punzalan, "I'm a gun guy," when asked about his familiarity with firearms. VRP (June 28, 2016) at 359.

Punzalan testified on cross examination as follows:

[Defense]: Yesterday you testified he was – well, you said it was unclear as to what happened; is that correct?
[Punzalan]: With regard to the point of how the weapon discharged, I don't think that was ever explained by Mr. Perez Calderon.
[Defense]: He said he didn't know; is that right?
[Punzalan]: [He] never explained it.
[Defense]: He said he didn't know how it went off?
[Punzalan]: Yes, sir.
[Defense]: He was consistent through that. You asked him several times?
[Punzalan]: Right. That is correct.
[Defense]: So he was never, ever able – other than hearing the gun go off, to give you – he said he just didn't know, right?
[Punzalan]: That is correct.
[Defense]: He said the gun was not in his hand, right?
[Punzalan]: Yes.
[Defense]: He said it happened when he was turning away after she was either swinging something at him or throwing something at him?
[Punzalan]: Right, flipping the table.
[Defense]: Flipping the table. Were you aware the table was found on its top?
[Punzalan]: Yes.

VRP (June 29, 2016) at 378-79. Calderon's attorney continued with this line of questioning:

[Defense]: You keep asking him questions and ask him possibilities that may have happened?
[Punzalan]: Certainly.
[Defense]: Part of your possibility, is it could have inadvertently gone off if it was in [Calderon's] hand when she flipped the table. That was one scenario you gave?

[Punzalan]: Right.

[Defense]: When he was turning or something?

[Punzalan]: Grabbed it inadvertently as the table flipped, as the table was coming toward him. A lot of possibilities.

[Defense]: A lot of possibilities in this case. He was consistent he didn't know what happened?

[Punzalan]: Yes.

[Defense]: The only thing we know for sure is it went off and she died as a result?

[Punzalan]: Correct.

VRP (June 29, 2016) at 388-89.

Dkt. 12-1, Ex. 2, *State v. Perez-Calderon*, 3 Wash. App. 2d 1015 (2018) (some footnotes omitted).

B.  Procedural Background

1.  *Direct Appeal*

Petitioner challenged his conviction and sentence on direct appeal. Dkt. 12-1, Ex. 4. The state court of appeals affirmed Petitioner's convictions. Dkt. 12-1, Ex. 2. Petitioner sought discretionary review by the Washington State Supreme Court ("state supreme court"). Dkt. 12-1, Ex. 7. On September 5, 2018, the state supreme court denied Petitioner's petition for review without comment. Dkt. 12-1, Ex. 8. The state court of appeals issued its mandate on September 11, 2018. Dkt. 12-1, Ex. 9.

2.  *Personal Restraint Petition*

On September 3, 2019, Petitioner filed a personal restraint petition ("PRP") seeking state post-conviction relief. Dkt. 12-1, Ex. 10. The state court of appeals dismissed the PRP on December 1, 2020. Dkt. 12-1, Ex. 3. Petitioner filed a motion for reconsideration on December 18, 2020. Dkt. 12-1, Ex. 14. The state court of appeals denied that motion on April 9, 2021. Dkt. 12-1, Ex. 15. Petitioner then sought discretionary review from the state supreme court, which was denied by the commissioner of the state supreme court on September 8, 2021. Dkt. 12-1,

Exs. 16, 17. Petitioner moved to modify the commissioner's decision. Dkt. 12-1, Ex. 18. The

state supreme court denied the motion to modify without comment and the state court of appeals

issued the certificate of finality on December 1, 2021. Dkt. 12-1, Exs. 19, 20.

3. *Federal Petition*

On February 24, 2022, Petitioner initiated this case. Dkt. 1. In his Petition, Petitioner

raises the following three grounds for relief:

1. Petitioner was denied his federal constitutional due process rights to effective assistance of appellate counsel.

2. Petitioner was denied his Sixth Amendment federal constitutional right to present a defense by the trial court's ruling prohibiting him from presenting evidence of the prior inconsistent statement of the prosecution's key witness.

3. Petitioner was denied his Sixth Amendment right to effective assistance of trial counsel by his trial counsel's failure to argue to the jury that the absence of gunshot residue demonstrated that Petitioner had not been holding the gun when it discharged.

Dkt. 1. On May 18, 2022, Respondent filed, and served on Petitioner, an Answer to the Petition.

Dkt. 11. In the Answer, Respondent asserts the state court's adjudication of the grounds raised in

the Petition was not contrary to, or an unreasonable application of, clearly established federal

law. *Id*. Petitioner filed a traverse on June 27, 2022. Dkt. 16.

**II.    Discussion**

Respondent maintains the state courts' adjudication of the grounds raised in the Petition

was not contrary to, or an unreasonable application of, clearly established federal law. Dkt. 11.

A.  Standard of Review

Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the

basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States." In interpreting this portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529 U.S. at 407).

The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of state court decisions under §2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

1       B.  Right to Present a Defense (Ground 2)

2           In Ground 2, Petitioner claims that an error of state law at his trial, specifically the trial

3   court's exclusion of one witness's testimony regarding another witness's prior inconsistent

4   statement, operated to deprive him of his due process right to present a defense as guaranteed by

5   the Fourteenth Amendment. Dkt. 2.  Respondent argues that the trial court's ruling is a question

6   of state law and not cognizable under § 2254. Dkt. 11, at 18. Respondent further argues that the

7   trial court's exclusion of such evidence did not violate Petitioner's right to present a complete

8   defense. *Id*. at 23–32.

9           Initially, the Court notes that it does not "review questions of state evidence law. On

10  federal habeas [the Court] may only consider whether the petitioner's conviction violated

11  constitutional norms." *Jammal v. Van de Kamp*, 926 F.3d 918, 919 (9th Cir. 1991); *Estelle v.*

12  *McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to

13  reexamine state-court determinations on state law questions"). "[F]ailure to comply with the

14  state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief."

15  *Id.*; *Marshall v. Longberger*, 459 U.S. 422, 438 n. 6 (1983) (citing *Spencer v. Texas*, 385 U.S.

16  554, 564 (1967)) ("the Due Process Clause does not permit the federal courts to engage in a

17  finely-tuned review of the wisdom of state evidentiary rules: 'It has never been thought that

18  [decisions under the Due Process Clause] establish this Court as a rule-making organ for the

19  promulgation of state rules of criminal procedure.'"). "While adherence to state evidentiary rules

20  suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have

21  a fair trial even when state standards are violated; conversely, state procedural and evidentiary

22  rules may countenance processes that do not comport with fundamental fairness." *Jammal*, 926

23  F.2d at 919.

24

1      Even so, here Petitioner invokes federal law considerations by arguing that the trial

2  court's evidentiary ruling with respect to the witness's prior inconsistent statement violated his

3  due process right to present a complete defense. "Whether rooted directly in the Due Process

4  Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of

5  the Sixth Amendment, the Constitution guarantees defendants 'a meaningful opportunity to

6  present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California*

7  *v. Trombetta*, 467 U.S. 479, 485 (1984)) (internal citations omitted). However, the right to

8  present a defense "is not unlimited, but rather is subject to reasonable restrictions," such as

9  evidentiary and procedural rules. *United States v. Scheffer*, 523 U.S. 303, 308 (1998).

10      The Supreme Court has explained that "state and federal rulemakers have broad latitude

11  under the Constitution to establish rules excluding evidence from criminal trials." *Id*. The

12  Supreme Court has also noted its approval of "well-established rules of evidence [that] permit

13  trial judges to exclude evidence if its probative value is outweighed by certain other factors such

14  an unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South*

15  *Carolina*, 547 U.S. 319, 326 (2006); *see also Crane*, 476 U.S. at 689–90 ("the Constitution

16  leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is

17  'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or]

18  confusion of the issues.'") (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 675 (1986)).

19      The right to present a meaningful defense is implicated when exclusionary evidence rules

20  "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the

21  purposes they are designed to serve.'" *Holmes*, 547 U.S. at 324 (citing *Scheffer*, 523 U.S. at 308).

22  However, as the Supreme Court has itself noted, "[o]nly rarely have we held that the right to

23

24

1  present a complete defense was violated by the exclusion of defense evidence under a state rule of

2  evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (citations omitted).

3        Accordingly, the issue before the Court is whether the trial court committed an error

4  which rendered the trial so arbitrary and fundamentally unfair that it violated due process.

5  *Jammal*, 926 F.2d at 919; *Reiger v. Christensen*, 789 F.2d 1425, 1430 (9th Cir. 1986). "Under

6  AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair

7  may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established

8  Federal law,' as laid out by the Supreme Court." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th

9  Cir. 2009) (*citing* 28 U.S.C. § 2254(d)). Thus, if there is no clearly established federal law as

10  determined by the Supreme Court, habeas relief is barred even if the state court erroneously

11  admitted irrelevant or prejudicial evidence. *Id.* (citing *Carey v. Musladin*, 549 U.S. 70, 77

12  (2006)).

13        To succeed on Ground 2, Petitioner must show the trial court's decision to exclude

14  evidence presented through cross-examination of Detective Punzalan and related to MC's prior

15  inconsistent statement about Petitioner telling the victim to "bend over" was so arbitrary and

16  fundamentally unfair that it violated due process. *See Jammal*, 926 F.2d at 919. At trial, on direct

17  examination MC testified that she heard Petitioner tell the victim to "bend down" "a few times,"

18  and then heard the gun go off a "few minutes after." Dkt. 12-1, Ex. 24, at 894-95. On cross

19  examination, MC testified that she also told defense counsel in an interview prior to trial that

20  Petitioner had told the victim to "get down, or bend over." Dkt. 12-1, Ex. 24, at 897. However,

21  MC failed to mention this "bend down" statement in her June 2015 forensic interview. Dkt. 2, at

22  11. MC also did not mention the "bend down" statement to the two chaplains whom she spoke

23  with after the shooting while being transported to the police station. Dkt. 12-1, Ex. 3, at 44.

24

1  During his cross-examination of MC, defense counsel did not ask her about failing to include the

2  "bend down" statement in her June 2015 forensic interview.

3      The next day at trial, defense counsel sought to cross-examine Det. Punzalan about MC's

4  omission of this "bend down" statement during the June 2015 interview. *See* Dkt. 12-1, Ex. 25,

5  at 989-95. At sidebar, defense counsel argued that he could impeach MC's testimony regarding

6  the "bend down" statement as an inconsistent statement through the testimony of Det. Punzalan,

7  who was present for the June 2015 interview and did not hear her make the statement. *Id*. at 989–

8  90. After hearing argument, the trial court precluded the proposed examination, concluding, "I

9  don't think there is anything that is being impeached or being offered to impeach this statement

10  or her testimony through what has been presented to me in this offer of proof." *Id*. at 990.

11      In deciding this claim, the state court of appeals recognized the following evidence

12  presented at trial, evidence which this Court agrees is ample to convict Petitioner of the second-

13  degree murder that occurred on June 6, 2015:

14      A. Testimony

15          1. MC

16          MC was nine years old at the time of the trial. She testified that before the
    shooting, she saw her mother and Calderon arguing and saw her mother throw

17  something at Calderon, but her mother then sent her (MC) to her room. While in
    her room, MC "heard something like go, boom, kind of." 3 RP at 290. MC testified

18  that at one point she came out of the room and "sneaked and looked and . . . saw
    her [mother] lying down on the [floor]." *Id*.

19

20          The State questioned MC about the April 2016 interview and asked her if
    she recalled telling defense counsel that she saw Calderon holding the gun. MC
    initially responded that she "thought he was," but she later clarified that she did not

21  know if she actually saw him holding the gun. *Id*. at 297.

22          The State then asked MC if she heard Calderon tell her mother to do
    anything, and she responded that she heard him tell her to "bend down . . . [a] few

23  times." *Id*. She estimated that she heard the gun go off 10 or 15 minutes after
    Calderon told her mother to bend down.

24

1

2        On cross-examination, defense counsel asked MC if she remember[ed]
telling him during the April 2016 interview that Calderon had told her mother "to

3    get down, or bend over," and MC responded that she did. *Id.* at 300. Although
defense counsel questioned MC about whether she said anything during the June

4    2015 interview about seeing Calderon shoot her mother or seeing Calderon with
the gun, defense counsel did not ask MC if she had mentioned the "bend over"

5    statement before April 2016.

6        2. The Chaplains

7        Larry Huffman, one of the chaplains who took the girls to the police station,
testified that while he and his wife were with MC and GH, MC told them that she

8    had heard her mother and Calderon arguing in the living room and that her mother
had asked her to go out on the back porch with her sister. MC stated that she was

9    on the porch praying for her mother when she heard "a loud bang." *Id.* at 320.

10        Diane Huffman, the other chaplain, testified that she talked with MC after
they arrived at the police station. *Id.* at 327. MC told Diane Huffman that Hughes

11    and Calderon were fighting and getting loud and that she (MC) took her sister out
on the back porch when the girls were asked to leave the room. MC said that the

12    screaming got louder and she (MC) started to pray. MC said that "shortly after she
stopped her prayer she heard a gunshot." *Id.*

13        On cross-examination, defense counsel asked Diane Huffman if MC had
mentioned a nutcracker. Diane responded, "[MC] told me that her grandma had sent

14    the girls a nutcracker for Christmas. It was sitting on the dresser in her bedroom,
and that there were times at night when the nutcracker would talk to her." *Id.* at

15    332. MC also told Diane Hoffman that "the nutcracker told her [(MC)] it hated her
and that she was going to die." *Id.* at 333.

16
        Neither Larry nor Diane Huffman testified that MC mentioned hearing
17    Calderon tell Hughes to bend down.

18        3. Medical Examiner

19        Pierce County Medical Examiner Dr. Thomas Clark testified that the bullet
that killed Hughes entered her right upper chest and then "passed backward, down

20    [towards her feet] and slightly to the left." 4 RP at 473–74. The bullet passed
through Hughes's first rib on the right side, lacerated her aorta, pierced the lower

21    lobe of her right lung, and continued through her until it lodged in her spine.

22        Dr. Clark testified that the "wound tract" was "consistent with the shooter
standing facing Ms. Hughes and she was bent over toward him." *Id.* at 489. But on

23    cross-examination, Dr. Clark agreed that the wound track could also be consistent
with someone stumbling, "depend[ing] on which way the person was stumbling."

24

*Id*. He further testified that he had no way of knowing whether Hughes had been standing or seated when she was shot. Dr. Clark also testified that because there was no stippling on Hughes, there was no indication that the gun was fired less than two feet away from Hughes.

Dkt. 12-1, Ex. 3, at 43–45.

At closing, defense counsel was able to argue the defense theory that he now asserts was precluded. *See* Dkt. 12-1, Ex. 26. The state court of appeals detailed the argument as follows:

2. Defense Closing Argument

In Calderon's closing argument, defense counsel argued that the shooting was accidental and that Calderon did not shoot Hughes. Defense counsel's argument largely focused on witness credibility.

As to MC's "bend down" statement, defense counsel argued that if Hughes had been bent over when she was shot, she would have fallen face down and that there was no evidence that she fell forward. Defense counsel also suggested that the medical examiner's testimony that the bullet may have deflected a bit when it hit the rib would support this theory.

Defense counsel then discussed MC's testimony and her credibility,

[MC], now we can all feel for this young lady having to get up here and testify, a nine-year-old girl, eight-year-old girl. It is a horrible thing. I would suggest to you that what she says is inconsistent. Did she pray or not? I don't know. I don't know that it matters. She probably did.

When she told the chaplain she had herself praying going out to the back deck and praying out there. She did acknowledge later on that she never went out to the deck. She went to the room and closed the door.
*Id*. 648-51 (emphasis added).

*Did she say that she heard my client tell Ms. Hughes to bend over? Yeah, she said that. She didn't say when that happened. I am going to suggest to you that that is a creation of her memory that happened in April that didn't exist before.*

Now, this is illustrative Exhibit No. 79. You are also not going to have this one back in the jury with you because it is not admitted as substantive evidence. For purposes of argument – I don't know if I was shown to you. In April of this year in an interview, [MC] drew this. She draws this. She had this in her mind, my client coming up with a gun in his hand to Ms. Hughes and leaning over her and shooting her.

REPORT AND RECOMMENDATION - 13

1

2          Now, she acknowledged, well, she was just trying to come up with an
3   explanation as to what happened. I have no doubt that that is true, and that's
    consistent with what she says. In the context of coming up with an
    explanation, she could very easily have said, as part of that, that I heard him
3   say "bend over," even though she never told the chaplains that or anybody
4   else.

5          On top of that, the reason we ask these questions, is this nutcracker a
    big deal? Well, yeah, it is because she has, in the same context of this
6   conversation, this talking nutcracker. Now, it is sad. Maybe it is sweet. I
    don't know. What it does show in the context of it being able to say that,
7   and being able to have that be a real thing for her, is that she is very
    imaginative or perhaps suffers from nightmares, I don't know what. She can
8   create things that are impossible to do. She acknowledged she created one
    scenario again to explain what happened.
9
           When you look at the credibility of the witnesses, including this young
10  lady, these are the things you should look at.

11         The reason the nutcracker is important for looking at one's credibility is
    it show this great imagination she has. I would suggest to you the
12  imagination she has is not credible. She is trying to come up with an
    explanation as to what happened. That's natural. She wants to explain
13  because she lost her mother. We would . . . all expect her to do that.

14      *Id.* 648-51 (emphasis added).

15  Dkt. 12-1, Ex. 3, at 48–50.

16      After setting out this evidence and argument established at trial, the state court of appeals

17  affirmed the trial court's ruling on the exclusion of MC's omission of the "bend over" statement

18  at the June 2015 interview through Det. Punzalan's testimony. Dkt. 12-1, Ex. 3, at 51–52.

19  Specifically, the court held that the trial court properly excluded the evidence under Washington

20  law because Petitioner failed to establish the requisite foundation:

21         Calderon contends that the trial court erred when it concluded that MC's
    failure to mention the "bend over" statement in the June 2015 interview was not an
22  inconsistent statement and asserts that there was a reasonable probability that the
    outcome of the appeal would have been different if appellate counsel had raised
23  this issue.[ ] This argument fails.

24

REPORT AND RECOMMENDATION - 14

1
2
          Calderon argues that the trial court erroneously determined that an omission in a prior statement can never be a prior inconsistent statement. The record does not, however, support this assertion.

3
4
5
6
7
8
9
          When the trial court excluded Punzalan's testimony about the June 2015 interview, the court stated, "I don't think there is anything that is being impeached or being offered to impeach this statement or her testimony through what has been presented to me in this offer of proof. I am not going to allow you to go into this area at this point in time." 4 RP at 396. The trial court's specific reference to the adequacy of the offer of proof belies the conclusion that it relied on the legal premise that a prior omission can never be a prior inconsistent statement. The trial court instead ruled that Calderon failed to establish the foundation required to admit the statement as a prior inconsistent statement, namely that the State afford MC "an opportunity to explain or deny" the statement, which suggests that the trial court relied on ER 613(b). *Id*. at 395. Thus, Calderon does not show that the outcome of his appeal would have been different if appellate counsel had raised this issue in the appeal.[ ]

10    *Id*. (some footnotes omitted).

11    Upon review, the Court first finds that, in light of the evidence presented at trial,

12    Petitioner has not shown that the trial court's decision to not allow Det. Punzalan to testify about

13    MC's prior inconsistent statement based on a state evidentiary rule resulted in a trial being so

14    arbitrary and fundamentally unfair that it violated due process. The record does not support

15    Petitioner's claim that the trial court's ruling deprived him of his right to present a defense. In

16    fact, Petitioner was able to present evidence that MC did not make the "bend down" statement to

17    the chaplains to whom she spoke on the day of the shooting. *See* Dkt. 12-1, Ex. 3, at 44. In his

18    closing defense counsel argued that omission as well as the fact that MC did not make the "bend

19    down" statement during her June 2015 forensic interview, but rather made it for the first time in

20    April 2016. *Id*. at 48–49. Notably, defense counsel had the opportunity to cross-examine MC

21    about the omission of the "bend down" statement but did not do so. *See* Dkt. 12-1, Ex. 24, at

22    908–12. Further, in light of the substantial evidence of guilt, including forensic scientist Johan

23    Schoeman's testimony that the gun would not have fired without the trigger being pulled with

24

1  about "seven and a quarter pounds" of force (Dkt. 12-1, Ex. 3, at 47), the failure to permit Det.

2  Punzalan's testimony at issue did not render the trial fundamentally unfair. As such, even if the

3  trial court had improperly precluded Det. Punzalan's testimony, that error would not have risen

4  to the level of constitutional error. *See United States v. Agurs*, 427 U.S. 97, 112–13 (1976)

5  (stating constitutional error occurs only in the rare case when the trial court excludes material

6  evidence that would have created a reasonable doubt that did not otherwise exist, and that

7  omission must be evaluated in the context of the entire record).

8        Further, to the extent that Petitioner is challenging the state evidentiary rule itself, a

9  challenge to a state evidentiary rule is not a sufficient basis for granting federal habeas relief. *See*

10  *Mejia v. Garcia,* 534 F.3d 1036, 1046 (9th Cir.2008) (due process right concerning the admission

11  of propensity evidence is not clearly established as required by § 2254(d)); *Bugh v. Mitchell*, 329

12  F.3d 496, 512–13 (6th Cir.2003) (state court decision allowing admission of evidence pertaining to

13  petitioner's alleged prior, uncharged acts of child molestation was not contrary to clearly

14  established Supreme Court precedent because there was no such precedent holding that the state

15  violated due process by permitting propensity evidence in the form of other bad acts evidence).

16  Even if it were the task of this Court to review the state trial court's application of its own state

17  evidentiary rules, the record demonstrates a substantial basis for finding the court's evidentiary

18  decision appropriate.[1] *See generally* Dkt. 12-1.

19        Finally, viewing the evidence as a whole, regardless of any alleged error in failing to admit

20  evidence of MC's prior inconsistent statement through Det. Punzalan's testimony, that error was

---

[1] Petitioner dedicates much of his briefing to his contention that the trial court's refusal to permit the impeachment evidence through Det. Punzalan's testimony was evidentiary error, purportedly under both state and federal law. *See* Dkt. 2, at 22–39; Dkt. 16, at 5–24. As set forth herein, even if the Court were to determine the trial court's evidentiary ruling was in error, that evidentiary error would not have risen to the level of constitutional error and it would have been harmless.

harmless. As set forth above, even a constitutional error requires vacatur of the state court

conviction on habeas review only if the error "had a substantial and injurious effect or influence in

determining the jury's verdict." *Brecht*, 507 U.S. at 637–38. Here, the evidence of Petitioner's guilt

was substantial. *See generally* Dkt. 12-1. And, by contrast, Petitioner's factual theory to counter the

State's case was weak. Nevertheless, Petitioner was able to present his defense, despite the

exclusion of Det. Punzalan's testimony about MC's prior inconsistent statement. The problem with

the defense was not the excluded evidence. Since the admission of Det. Punzalan's relevant

testimony would not likely have changed the verdict, any error in excluding it was harmless. *See*

*Brecht*, 507 U.S. at 637–38.

        In sum, Petitioner has failed to demonstrate the state court's conclusion that the exclusion

of evidence did not impede his ability to adequately present a defense was contrary to, or an

unreasonable application of, clearly established federal law. Accordingly, the Court recommends

that Ground 2 of the Petitioner be denied.

        C.   Ineffective Assistance of Appellate Counsel (Ground 1)

        In Ground 1, Petitioner alleges his appellate counsel was ineffective for failing, on direct

appeal, to raise his claim that he was denied the right to present a complete defense. Dkt. 1, at 5.

Specifically, he contends that counsel on direct appeal should have argued that the trial court

erred by not allowing evidence that could impeach MC with a prior inconsistent statement. Dkt.

2, at 39–41.

        Claims of ineffective assistance of counsel on appeal are reviewed under a deferential

standard similar to that established for trial counsel ineffectiveness in *Strickland*. *See Smith v.*

*Robbins*, 528 U.S. 259, 285 (2000); *Smith v. Murray*, 477 U.S. 527, 535 (1986). Under this

standard, a petitioner challenging his appellate counsel's performance must demonstrate (1)

1    counsel's performance was unreasonable, which in the appellate context requires a showing

2    counsel acted unreasonably in failing to discover and brief a meritorious issue, and (2) there is a

3    reasonable probability, but for counsel's failure to raise the issue, the petitioner would have

4    prevailed on his appeal. *Robbins*, 528 U.S. at 285–86; *see also Wildman v. Johnson*, 261 F.3d

5    832, 841–42 (9th Cir. 2001); *Morrison v. Estelle*, 981 F.2d 425, 427 (9th Cir. 1992), *cert. denied*,

6    508 U.S. 920 (1993); *Miller v. Keeney*, 882 F.2d 1428, 1433–34 (9th Cir. 1989).

7        The presumption of reasonableness is even stronger for appellate counsel because he has

8    wider discretion than trial counsel in weeding out weaker issues; doing so is widely recognized

9    as one of the hallmarks of effective appellate assistance. *Miller*, 882 F.2d at 1434. The exercise

10    of professional judgment in framing appellate issues makes it difficult to demonstrate counsel's

11    omission of a particular argument was deficient performance. *Robbins*, 528 U.S. at 288. Habeas

12    relief is unavailable on a claim of appellate-counsel ineffectiveness unless the state court's denial

13    of the claim "was so lacking in justification that there was an error well understood and

14    comprehended in existing law beyond any possibility for fair[-]minded disagreement."

15    *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

16        In addressing this claim of ineffective assistance of appellate counsel, raised in

17    Petitioner's PRP, the state court of appeals concluded that the substantive claim that Petitioner's

18    right to present a defense was violated was without merit. Finding no constitutional error because

19    Petitioner was still able to argue his defense to the jury, the state court then turned to Petitioner's

20    claim of appellate counsel's ineffectiveness for failing to raise the claim and concluded it was

21    also without merit:

22        MC's failure to present evidence that MC did not disclose the "bend down"
        statement during the June 2015 interview did not prevent Calderon from presenting
23        his defense. The trial court's ruling in no way prevented Calderon from cross-
        examining MC about whether she had mentioned the "bend down" statement during

24

her June 2015 interview. And similar evidence was presented at trial based on MC's statements to the chaplains, and defense counsel was able to argue that MC failed to disclose the "bend down" statement until April 2016 by pointing out that omission. Ultimately, Calderon was able to, and in fact did, argue that the "bend down" statement was a new disclosure in April 2016, and that MC fabricated this statement, as well as other facts, in an attempt to make sense of what had happened to her mother. [court footnote: Furthermore, the trial court's ruling did not entirely prevent Calderon from presenting this evidence to the jury because the ruling did not preclude Calderon from calling MC as a witness and asking her directly about what she disclosed during the June 2015 interview and then impeaching her if necessary.] Furthermore, the evidence that the shooting was not accidental was overwhelming in light of Schoeman's testimony that the gun would not fire without significant force being applied to the gun's trigger, which was protected by a trigger guard.

We hold that because Calderon was able to argue his defense theory to the jury and the additional evidence would have had little impact because of the overwhelming evidence that the only way the gun fired was if the trigger was pulled, his "right to present a defense" was not violated, and Calderon does not show that the outcome of the appeal would have been different if appellate counsel had raised this issue. *See id*. Accordingly, this ineffective assistance of appellate counsel claim also fails.

Dkt. 12-1, Ex. 3, at 53–54.

The commissioner of the state supreme court agreed with the state court of appeals reasoning and concluded that Petitioner's ineffective assistance of appellate counsel claim was without merit. Dkt. 12-1, Ex. 17, at 506–07.

Here, there is no basis to conclude that the performance of Petitioner's appellate counsel was deficient. Consistent with federal law, the state supreme court reasonably found that because Petitioner's underlying claim was without merit, appellate counsel was not ineffective for failing to raise such a claim. Since Ground 2 lacks any merit, Petitioner's appellate counsel cannot be deemed ineffective for failing to raise it on direct appeal.

Petitioner has failed to show that the state appellate courts' rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. Therefore, the Court recommends that Ground 1 of the Petition be denied.

1    D.   <u>Ineffective Assistance of Trial Counsel (Ground 3)</u>

2    In Ground 3, Petitioner alleges he received ineffective assistance of counsel when his trial

3    counsel failed to argue during closing argument that the lack of testing for gunpowder residue on

4    Petitioner's hands created a reasonable doubt that he committed the offense. Dkt. 1 at 5.

5    In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court created a two-part

6    test for determining whether a defendant received ineffective assistance of counsel. First, a

7    defendant must demonstrate his attorney's performance was deficient, which requires showing

8    "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by

9    the Sixth Amendment." *Id.* at 687. Second, a defendant must demonstrate the deficient

10   performance prejudiced the defense to such a degree the results of the trial cannot be trusted. *Id.*

11   Under the first prong, the reasonableness of an attorney's performance is to be evaluated

12   from counsel's perspective at the time of the alleged error and in light of all the circumstances.

13   *Id.* at 690. The petitioner must carry a heavy burden, as "reviewing courts must indulge a strong

14   presumption that counsel's conduct falls within the wide range of professional assistance; that is,

15   the defendant must overcome the presumption that, under the circumstances, the challenged

16   action might be considered sound trial strategy." *Id.* at 689 (citation omitted).

17   Under the prejudice prong, a petitioner must establish there is a reasonable probability the

18   results would have been different but for counsel's deficient performance. *Kimmelman v.*

19   *Morrison,* 477 U.S. 365, 375 (1986); *Strickland,* 466 U.S. at 696. "A reasonable probability is a

20   probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

21   Here, the state court of appeals applied the *Strickland* standard in determining that

22   Petitioner's trial counsel was not ineffective during closing argument. *See* Dkt. 12-1, Ex. 3, at 55.

23   Citing the "unrefuted evidence from the State's witnesses regarding the reasons gunshot residue

24

REPORT AND RECOMMENDATION - 20

tests are not routinely conducted," the court held "there was no reasonable probability that the verdict would have been different had trial counsel argued that the lack of gunshot residue testing created a reasonable doubt." *Id*. at 57. The state supreme court agreed, finding:

> . . . Mr. Calderon contends that trial counsel should have emphasized the negative gunshot residue evidence during closing arguments. However, this argument runs contrary to the presumption that closing arguments are a fundamental matter of trial strategy. "[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5–6, 124 S. Ct. 1, 157 L.Ed.2d 1 (2003). And here, as the Court of Appeals explained, the State had presented forensic specialist testimony that the lack of gunshot residue in the circumstances of this shooting was not relied upon by investigators because there were too many false positive results. Counsel would have risked losing credibility with the jurors by making an argument that went against the State's unrefuted explanation regarding the lack of gunshot residue evidence. [court footnote: I note that although Mr. Calderon obtained an affidavit from his trial attorney supporting one of his claims, nothing in that affidavit admits to any mistake made during closing argument.] In these circumstances, Mr. Calderon shows neither that trial counsel's performance was deficient nor that there is any basis for reviewing this issue under RAP 13.4(b).

Dkt. 12-1, Ex. 17, at 504–05.

Petitioner argues that his trial counsel was ineffective for failing to argue during his closing that the lack of gunshot residue testing on Petitioner's hands raised a reasonable doubt as to his guilt of second-degree murder. Dkt. 2.

During trial, the State presented evidence regarding gunshot residue. As outlined by the state court of appeals, this evidence was used to explain why gunshot residue testing did not occur in this case:

> 4. Detective Christopher Bowl
>
> Detective Christopher Bowl testified that the police swabbed Calderon for biological evidence but not for "gunshot residue." *Id*. at 500. Bowl stated that the police did not conduct gunshot residue tests anymore because there were too many false positives from these tests.

5. Forensic Scientist

Forensic scientist Johan Schoeman from the Washington State Patrol Crime Laboratory testified about gunshot residue testing and gun testing.

Schoeman described the two types of gunshot residue that are created when a gun fires, primer residues and soot,

> Primer residue are the barium, lead and antimony that you will get on the primer of that cartridge. Every opening that the gun had when you pull the trigger and this whole chain reaction of burning starts taking place, the primer residue will land on your hands, your clothes, or on surfaces around the area where the firearm was discharged. Some of that primer residue from the primer also exits the muzzle of the gun.
> The second part will be the soot, particularly burned, and any burned propellant particles or gunpowder leaving the muzzle of the gun and gets deposited on clothing, on a victim's shirt, jacket or jersey or whatever the case may be in the form of a circle . . . . If you are far away, you will have a big pattern. The closer you move towards the muzzle of the gun, the smaller the pattern is going to be.

5 RP at 562.

Schoeman further testified that although the laboratory still tested clothing for soot residue, it had not tested for primer residue since August 1996, because "[s]tudies have found it is not very reliable." *Id*. at 563. Specifically, he testified,

> If you and I are in the same room, and I fire a gun and you are close to me, you're going to pick up some of the primer residue. If you test positive for primer residue, does it mean you fired the gun? If you are tested negative for primer residue, does it mean you did not fire the gun? If you fire a gun and you just wipe your hands, you are getting rid of the primer residue because it is so small and so light you can rub it off, and then you will test negative. Primer residue is going to land on surfaces. If you just go with your hand like this over a table or area the gun was discharged, you are going to test positive for primer residue, and I wipe mine off (sic). So *there is no real significance on performing the primer residue examinations*. That is why we haven't done i[t] for the last 30 years, since 1996.

*Id*. (emphasis added).

Additionally, Schoeman testified that the gun had a "drop safety" that prevented the gun from firing unless the gun's trigger was pulled. 4 RP at 533. He also stated that the gun had a trigger guard that would minimize the risk that the trigger would be accidentally pulled if the gun were dropped.

1

2

3

4

5

> Schoeman further testified that he had conducted a series of "drop tests" on the gun to determine if the gun would discharge if it fell, was dropped, or was bumped against something. 5 RP at 558. Schoeman was unable to get the gun to fire if he hit it with a rubber mallet while the gun was cocked or by dropping the gun in various orientations from a distance of about four feet. He testified that he would have been able to determine "[i]f this had a slight possibility of going off" if dropped or struck and that the tests revealed that it would not have fired without the trigger being pulled with about "seven and a quarter pounds" of force. [court footnote: Schoeman testified that picking up a gallon of milk with one finger created a force against the finger of approximately eight pounds.] *Id.* at 560-61.

6

Dkt. 12-1, Ex. 3, at 45–47.

7

8

During his closing argument, defense counsel did not argue to the jury that there was a

9

reasonable doubt as to whether Petitioner had gunshot residue on his hands. Dkt. 13, Ex. 26

10

(corrected), at 98–115. Rather, counsel argued, "[a]ll the evidence here is entirely consistent with

11

a plausible explanation of an accident." *Id.* at 107. He continued:

12

13

14

> [T]hese are plausible explanations. Let's say because he doesn't remember, let's say he is trying to grab the gun off the table, trying to grab it off because he's afraid she's going to get it, that she's going to accidentally fire it, what the situation would be. Let's say in the course of this, this chalice or the table hits his hand and accidentally goes off, deflects off or it hits her directly. All of these are plausible explanations and reasonable.

15

*Id.* at 113–14. The state supreme court found that counsel's failure to argue negative gunshot

16

residue evidence was a matter of trial strategy, reasoning that because the State presented

17

testimony that investigators did not rely upon gunshot residue testing in this case because it

18

produces too many false positive results, counsel would have risked losing credibility with the

19

jury by making such an argument. Dkt. 12-1, Ex. 17, at 504–05. The Court agrees. When

20

analyzing ineffective assistance of counsel, "the relevant inquiry under *Strickland* is not what

21

defense counsel should have pursued, but rather whether the choices made by defense counsel

22

were reasonable." *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998). Here, defense

23

counsel's actions could reasonably be attributed to the desire not to draw attention to the unrefuted

24

1    explanation regarding the lack of gunshot residue evidence. The Court has a strong presumption

2    that counsel's actions were sound trial strategy rather than inappropriate error. *Strickland*, 466 U.S.

3    at 689. Further, because the Court also presumes the state court made a reasonable determination,

4    the Court's presumption that trial counsel acted effectively is "doubly deferential when it is

5    conducted through the lens of federal habeas." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).

6    Petitioner has not provided anything to demonstrate that trial counsel's actions at closing argument

7    were in error or that the error changed the outcome of the trial. *Strickland*, 466 U.S. at 689. Thus,

8    when determining counsel was not ineffective, the state court did not make a decision contrary to,

9    or an unreasonable application of, clearly established federal law. Accordingly, the Court

10    recommends that Ground 3 of the Petition be denied.

11    **III.    Evidentiary Hearing**

12         The decision to hold an evidentiary hearing is committed to the Court's discretion.

13    *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

14    hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

15    entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is

16    available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the

17    state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not

18    entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the

19    record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

20    court is not required to hold an evidentiary hearing." *Id*. The Court does not find it necessary to

21    hold an evidentiary hearing because, as discussed in this Report and Recommendation,

22    Petitioner's grounds for relief may be resolved on the existing state court record.

23

24

**IV.     Certificate of Appealability**

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or would conclude the issues presented in the Petition should proceed further. Therefore, the Court concludes Petitioner is not entitled to a certificate of appealability with respect to any of the grounds raised in the Petition.

**V.     Conclusion**

For the above stated reasons, the Court finds Grounds 1, 2, and 3 of the Petition should be denied as Petitioner has not demonstrated that the state courts' adjudication of these grounds was contrary to, or an unreasonable application of, clearly established federal law. The Court also finds an evidentiary hearing is not necessary. Accordingly, the Court recommends the Petition be denied and a certificate of appealability not be issued.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit

1    imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

2    August 19, 2022, as noted in the caption.

3            Dated this 3rd day of August, 2022.

4

5                                                David W. Christel
                                                 United States Magistrate Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24